## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **CHRISTINE PIERCE,** | : | **Civil No. 1:20-CV-1394** |
| | : | |
| **Plaintiff** | : | **(Magistrate Judge Carlson)** |
| | : | |
| **v.** | : | |
| | : | |
| **ANDREW M. SAUL** | : | |
| **Commissioner of Social Security** | : | |
| | : | |
| **Defendant** | : | |

## MEMORANDUM OPINION

### I.    Introduction

Christine Pierce's Social Security appeal presents two closely intertwined

issues. First, Pierce argues that the Administrative Law Judge (ALJ) in her case erred

in failing to find that her emotional impairments met all listing requirements and

therefore were *per se* disabling at Step 3 of the sequential analysis which governs

Social Security disability determinations. Since several medical sources opined that

Pierce did not meet all of these listing requirements, this Step 3 argument is

dependent upon Pierce's second contention: her argument that the ALJ erred in

weighing this medical opinion evidence.

Mindful of the fact that substantial evidence "means only—'such relevant

evidence as a reasonable mind might accept as adequate to support a conclusion,'"

1

Biestek v. Berryhill, 139 S. Ct. 1148, 1154 (2019)., we find that substantial evidence supported the ALJ's weighing of this medical opinion evidence and the ALJ's Step 3 findings in this case. Therefore, for the reasons set forth below, we will affirm the decision of the Commissioner denying this claim.

## II.    Statement of Facts and of the Case

Christine Pierce applied for Social Security benefits in April of 2018 alleging that she was totally disabled due to scoliosis, degenerative disc disease, Scheuermann's disease, obesity, arthritis, bipolar anxiety disorder, attention deficit hyperactivity disorder and depression. (Tr. 18, 21). Pierce was born in July of 1979, and was 37 years old at the time of the alleged onset of her disability in February of 2017. (Tr. 30). She had graduated high school, attended college, and had a work history as a caregiver and residential aide. (Id.)

With respect to Pierce's emotional impairments, Pierce's educational records indicated that she had been placed on an Individual Education Plan in high school, but also reflected that Pierce had the capacity to perform routine tasks. (Tr. 205-30). Following her graduation from high school and college, Pierce moved from Pennsylvania to California where she worked as a caregiver and counselor. (Tr 263). While on California in 2013, Pierce experienced a severe psychiatric episode that resulted in her hospitalization at the Del Amo Hospital. (Tr. 452-96). Records of this

psychiatric hospitalization, which pre-dated the alleged onset of her disability by 3 ½ years, indicated that Pierce was severely impaired upon admission, with a Global Assessment of Functioning, or GAF, score of 25 when she was admitted. Upon discharge, her Global Assessment of Functioning score had improved to 55.[1]

---

[1]These were clinically significant findings since:

A GAF score, or a Global Assessment Functioning scale, was a psychometric tool which took into consideration psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness. *Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition, Text Revision*, 34, Washington, DC, American Psychiatric Association, 2000. ("DSM-IV-TR"). In this regard, GAF scores "in the range of 61–70 indicate 'some mild symptoms [of depression] or some difficulty in social, occupational, or school functioning.' Diagnostic and Statistical Manual of Mental Disorders ('DSM IV') 34 (American Psychiatric Assoc. 2000). GAF scores in the 51–60 range indicate moderate impairment in social or occupational functioning." Cherry v. Barnhart, 29 Fed.Appx. 898, 900 (3d Cir. 2002). DaVinci v. Astrue, 1:11-CV-1470, 2012 WL 6137324 (M.D. Pa. Sept. 21, 2012) report and recommendation adopted, Davinci v. Astrue, 1:11-CV-1470, 2012 WL 6136846 (M.D. Pa. Dec. 11, 2012). "A GAF score of 41–50 indicates 'serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) [or] any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job).' DSM–IV at 34. A score of 50 is on the borderline between serious and moderate symptoms." Colon v. Barnhart, 424 F. Supp. 2d 805, 809 (E.D. Pa. 2006). See Shufelt v. Colvin, No. 1:15-CV-1026, 2016 WL 8613936, at *2 (M.D. Pa. Sept. 15, 2016), report and recommendation adopted sub nom., Shulfelt v. Colvin, No. 1:15-CV-1026, 2017 WL 1162767 (M.D. Pa. Mar. 29, 2017). A GAF score of 31-40 signifies some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) or major impairment in several areas, such as work or

Upon her return to Pennsylvania, Pierce:

> [P]articipated in mental health treatment at Northern Tier Counseling Services. A mental status examination in August of 2017 showed that the claimant was anxious and that her thought process was circumstantial. However, her affect was congruent and full, and her insight and judgment were intact. The claimant exhibited no homicidal/suicidal ideations and reported experiencing no perceptual disturbances (Exhibits 11F, pages 16 through 20 and 21F, pages 13 through 17). In August of 2018, mental status examination findings showed that the claimant's thought processes were coherent and without hallucinations, delusions, or paranoia. Her affect was restricted, her mood was neutral, and her attention/concentration was mildly to moderately impaired. Her memory was also impaired, but the claimant retained the ability to manage her own money (Exhibit 12F, pages 4, 5, and 6). A psychological evaluation in November of 2018 revealed that the claimant, a holder of a Bachelor's Degree in social work, wrestled with intrusive thoughts. She maintained, however, that she did not believe that she would act upon them (Exhibit 15F, page 2). The claimant was well-oriented and her insight and judgment were fair. While she was anxious, no unusual behaviors were noted throughout the evaluation process (Exhibit 24F, page 25). Records show that the claimant participated in the Wellness Center program throughout May of 2019. However, the records from this facility showed that she

---

school, family relations, judgment, thinking, or mood. A GAF scores as low as 30 typically indicate behavior that is considerably influenced by delusions or hallucinations, or serious impairment in communication or judgment, or an inability to function in almost all areas. *Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition, Text Revision*, 34, Washington, DC, American Psychiatric Association, 2000. ("DSM-IV-TR").

Jones v. Colvin, No. 1:16-CV-1535, 2017 WL 4277289, at *2 (M.D. Pa. Sept. 25, 2017), report and recommendation adopted sub nom., Jones v. Berryhill, No. 1:16-CV-1535, 2017 WL 4314572 (M.D. Pa. Sept. 27, 2017). Thus, Pierce's discharge GAF score of 55 was emblematic of only a moderate degree of mental impairment.

addressed many issues, including nutrition/weight loss and that mental health counseling was not the sole purpose of this program (Exhibit 25F).

(Tr. 26).

In addition to these group and individual counseling programs, Pierce also maintained a medication regime to sustain her emotional equilibrium taking multiple medications, including Trazadone, Lorazepam, Prilosec, Neurontin, Gabapentin, and Klonopin to address her physical and emotional impairments. (Tr. 25, 51-52).

Given this mental health history, four medical sources have opined regarding the degree to which Pierce's emotional impairments were disabling. At the outset, in August of 2018, a state agency expert, Dr. Lori Young, reviewed Pierce's medical records and concluded that in many spheres of work-related activity such as attention, concentration, ability to follow instructions, and work with others and the public, Pierce exhibited no more than a moderate degree of impairment. (Tr. 106-09, 115-17, 135, 37).

Likewise, a consulting examination source, Dr. Amanda Slowik, found in August of 2018 that Pierce displayed a moderate degree of impairment when it came to understanding and carrying out simple instructions and making simple work-related decisions. Dr. Slowik detected no limitations on Pierce's ability to work with

the public or co-workers, but concluded that she had marked limitations when it came to complex instructions and judgments in the workplace. (Tr. 756-63).

In contrast, a treating source, Shannon Nobles, a nurse practitioner at Northern Tier Counseling, completed a check box form in November of 2018, which opined that Pierce faced marked to extreme limitations in her ability to carry out simple instructions, maintain concentration, work with others, and follow the directions of supervisors. (Tr. 781-2). Dr. J.F. McNamara also completed a psychological evaluation of Pierce in November of 2018 which detailed her medical history, diagnoses and treatment, but did not provide any specific opinions regarding her ability to perform tasks in the workplace. (Tr. 783-87)).

It was against this clinical backdrop that an ALJ conducted a hearing regarding Pierce's disability application on July 9, 2019. (Tr. 39-77). Pierce and a vocational expert both appeared and testified at this hearing. (Id.) In her testimony, Pierce described the severity of her emotional symptoms in terms that were not entirely consistent with the records of her treatment providers. For example, Pierce testified to experiencing homicidal thoughts and hallucinations. (Tr. 61-63). However, Pierce's treatment records contained notations indicating that she denied such thoughts. (Tr. 106, 988).

Following this hearing on July 26, 2019, the ALJ issued a decision denying Pierce's application for benefits. (Doc. 15-32). In that decision, the ALJ first concluded that Pierce satisfied the insured status requirements of the Act. (Tr. 20). At Step 2 of the sequential analysis that governs Social Security cases, the ALJ found that Pierce suffered from the following severe impairments: scoliosis, degenerative disc disease, Scheuermann's disease, obesity, arthritis, bipolar anxiety disorder, attention deficit hyperactivity disorder, and depression. (Tr. 18 and 21).

At Step 3, however, the ALJ determined that Pierce did not have an emotional impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments. (Tr. 21-24). In reaching this conclusion, the ALJ specifically considered Listings 12.04, 12.06 and 12.11, and focused upon the paragraph B criteria in these listings. As the ALJ explained:

> To satisfy the "paragraph B" criteria, the mental impairments must result in at least one extreme or two marked limitations in a broad area of functioning that are: understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; or adapting or managing themselves. A marked limitation means functioning in this area independently, appropriately, effectively, and on a sustained basis is seriously limited. An extreme limitation is the inability to function independently, appropriately or effectively, and on a sustained basis.

(Tr. 22).

In Pierce's case, the ALJ found that these paragraph B criteria had not been met. Instead, the ALJ concluded that Pierce only experienced moderate limitations in these spheres of workplace functioning, stating that:

> In understanding, remembering, or applying information, the claimant has a moderate limitation. She said she requires reminders to address her personal care needs and to take the appropriate medication timely, and she said she has difficulty following written and oral directions. (Exhibit 7E and Hearing testimony). However, as will be discussed later in this decision in detail, the medical evidence of record does not document any significant memory deficits or cognitive abnormalities on mental status examinations. She was a good historian at the hearing, with no serious lapses in memory, comprehension, or concentration. In addition, until the date of his death, claimant was the caretaker for her significant other. Overall, the record does not establish more than a moderate limitation in the claimant's ability to understand, remember, and apply information.
>
> In interacting with others, the claimant has a moderate limitation. When she travels alone, she said her anxiety increases; nevertheless, she retains the ability to do so. The claimant does not have a vehicle, but when she drives, she said she becomes anxious. She is able to and does take public transportation. She shops in stores (in a public setting) for food and for other necessities. The claimant enjoys spending time with others and she reports no issues when interacting with family, friends, and neighbors. She said she does better with polite requests as opposed to being told sternly what to do by authority figures. The claimant resides in a home with family members (Exhibit 7E and Hearing testimony). The medical evidence of record does not document any serious issues interacting with her treatment providers, and she interacted appropriately at the hearing. The record does not establish more than moderate limitations interacting with others.
>
> With regard to concentrating, persisting, or maintaining pace, the claimant has a moderate limitation. She said she has pain throughout her back that causes limitation in her ability to concentrate and focus.

Nonetheless, the claimant retains sufficient cognitive ability to handle her financial affairs, including paying bills, counting change, and maintaining checking, savings, and credit card accounts. However, she said she tends to shop and to spend money impulsively. The claimant said she does not always finish what she starts and is able to pay attention for 5 minutes, at most. She said coping with stress and adapting to change is an ongoing challenge for her (Exhibit 7E and Hearing testimony). The record as a whole does not establish more than moderate limitations concentrating, persisting, or maintaining pace.

As for adapting or managing oneself, the claimant has experienced a moderate limitation. During the day, she attends the Wellness Center where she takes classes, and completes chores, including meal preparation. At home, the claimant addresses her personal care needs and she vacuums the floors. When she makes her own meals, she does so in the microwave. The claimant also washes dishes, cleans, sweeps, and mops (Exhibit 7E and Hearing testimony). In sum, after a review of the evidence as a whole, the record does not establish that the claimant suffers from more than moderate limitation in this domain. Because the claimant's mental impairments did not cause at least two "marked" limitations or one "extreme" limitation, the "paragraph B" criteria were not satisfied.

(Tr. 22-23).

In making this Step 3 determination, the ALJ necessarily was required to address and reconcile the competing medical opinion evidence in this case. On this score, the ALJ found the opinions of Dr. Young and Dr. Slowik to be more persuasive than the views expressed by Ms. Nobles or Dr. McNamara. In this regard, the ALJ first found that:

Lori A. Young, PsyD completed the state agency mental assessment on August 16, 2018. Therein, she indicated that the claimant's mental health issues, inclusive of anxiety and depression, cause the claimant to

incur moderate limitation in her ability to understand, remember, and apply information, moderate limitation in her ability to interact with others, moderate limitation in her ability to concentrate, persist, and maintain pace, and moderate limitation in her ability to adapt or to manage herself. In her residual functional capacity assessment, the claimant: had moderate limitation in her ability to carry out detailed instructions; moderate limitation in her ability to maintain attention and concentration for extended periods; moderate limitation in her ability to complete a normal workday/workweek without interruption from psychologically based symptoms; moderate limitation in her ability to interact with others; and moderate limitation in her ability to respond to changes in the work-setting (Exhibits 1A and 2A). The undersigned finds this opinion persuasive, as the evidence of record, inclusive of the mental status examination findings throughout the claimant's longitudinal clinical treatment history, show that the claimant is able to complete some daily tasks despite her ongoing mental health issues. The record confirms the claimant's allegations of suffering from a mental health disorder; however, the claimant's mental status examination findings generally show more moderate findings throughout her treatment history. The claimant contends that she participates in partial program treatment, but the program in which she is involved is comprised of various educational classes (such a conflict resolution, nutrition, women's groups, etc.) with minimal counseling/mental health treatment. Because the claimant's symptoms are generally mild to moderate at most (and her treatment is largely conservative), the evidence confirms that the claimant is able to complete a range of simple work, consistent with this opinion. As such, the undersigned finds this opinion persuasive. To the extent the above residual functional capacity differs from this opinion, it is to afford claimant all benefit of the doubt.

(Tr. 27-28).

As for Dr. Slowik, the ALJ found her opinion to be partially persuasive,

stating that:

Amanda Slowik, PsyD completed a consultative mental assessment of the claimant on August 13, 2018. Therein, she indicated that the claimant's depression and anxiety caused the claimant to incur limitation in her ability to work. In her residual functional capacity assessment, the claimant had: moderate limitation in her ability to understand, remember, and carry out simple instructions; moderate limitation in her ability to make simple work-related decisions; marked limitation in her ability to understand, remember, and carry out detailed instructions; marked limitation in her ability to make complex work-related decisions; and had no limitation in her ability to interact with others or to respond to pressures and changes in the work setting (Exhibit 12F). The undersigned finds this opinion partially persuasive. Although this opinion confirms that the claimant is not disabled (consistent with the evidence), Dr. Slowik both underestimates and overestimates the claimant's limitations. Specifically, finding that the claimant has no limitation when interacting with others is inconsistent with the evidence (she has anxiety in the presence of others, particularly with authority figures). Additionally, concluding that the claimant has marked limitation in her ability to make complex work-related decisions and to understand, remember, and carry out complex instructions exceeds the limitation that is supported by the mental status examination findings. Accordingly, the undersigned finds this opinion only partially persuasive (the claimant was however still limited to a range of simple work).

(Tr. 27).

The ALJ found the opinions expressed by Dr. McNamara and Ms. Nobles less compelling and persuasive, observing that:

On November 12, 2018, J.F. McNamara, PhD completed an assessment of the claimant and indicated that an individual who suffered from the claimant's combination of impairments typically experience significant disruption in his or her ability to work (Exhibit 15F, pages 3 and 4). The undersigned finds this opinion unpersuasive, as it speaks in generalities and as it does not afford a concrete assessment of the

claimant in relation to her specific ability to work. For these reasons, the undersigned finds this opinion unpersuasive.

Shannon Nobles of Northern Tier Counseling completed a mental impairment questionnaire on the claimant's behalf on November 19, 2018. Therein, she indicated that the claimant's mental health issues, inclusive of a bipolar disorder, an anxiety disorder, and ADHD caused the claimant to incur limitation in her ability to work. In her residual functional capacity assessment, the claimant was noted to have extreme limitation in her ability to interact with supervisors and mostly marked limitation in the remainder of the residual functional assessment categories. She added that the claimant would miss about 3 days of work per month due to her symptoms and that overall, she was unable to sustain fulltime work on a regular and continuing basis (Exhibit 14F). The undersigned finds this opinion unpersuasive, as the limitations suggested herein appear to underestimate the claimant's residual ability. Although the records clearly show that claimant has incurred some periods of increased symptomatology, overall, her mental status examination findings more consistently revealed more mild to moderate symptoms. The objective evidence corroborated the results of the examination findings, consistent with the claimant's ability to complete at least some household tasks. Because the claimant's signs, symptoms, and residual ability are more consistent with an individual who retains a residual functional capacity for simple work with limited contact with others, this opinion, an opinion that suggests complete disability, is found to be unpersuasive.

(Tr. 28).

Having made these findings, between Steps 3 and 4, the ALJ fashioned a residual functional capacity (RFC), considering Pierce's limitations from her impairments, which concluded that Pierce could:

[P]erform lightwork as defined in 20 CFR 404.1567(b) and 416.967(b) except the claimant: must avoid climbing; must be afforded an opportunity to change positions approximately once every hour; could

occasionally perform all postural activities (bending, stooping, kneeling, etc.); must avoid all overhead reaching; must avoid exposure to hazards and heights; must avoid performing work with detailed instructions; must avoid assembly line production type work; could complete routine and repetitive tasks in jobs with few workplace changes; and could have up to occasional contact with the public and coworkers.

(Tr. 24).

The ALJ then found that Pierce could not perform her past work, but retained the capacity to perform other jobs which existed in significant numbers in the national economy. (Tr. 29-31). Having reached these conclusions, the ALJ determined that Pierce had not met the demanding showing necessary to sustain her claim for benefits, and denied this claim. (Tr. 32).

This appeal followed. (Doc. 1). On appeal, Pierce advances a twofold claim. First, Pierce argues that the Administrative Law Judge (ALJ) in her case erred in failing to find that her emotional impairments met all listing requirements and therefore were *per se* disabling at Step 3 of the sequential analysis that governs Social Security disability determinations. Since Dr. Young and Dr. Slowik both sources opined that Pierce did not meet all of these listing requirements, this Step 3 argument is dependent upon Pierce's second contention: her argument that the ALJ erred in weighing this medical opinion evidence. This case is fully briefed and is,

therefore, ripe for resolution. For the reasons set forth below, under the deferential standard of review that applies here, the Commissioner's final decision is affirmed.

## III.  Discussion

### A.  Substantial Evidence Review – the Role of this Court

When reviewing the Commissioner's final decision denying a claimant's application for benefits, this Court's review is limited to the question of whether the findings of the final decision-maker are supported by substantial evidence in the record. See 42 U.S.C. §405(g); Johnson v. Comm'r of Soc. Sec., 529 F.3d 198, 200 (3d Cir. 2008); Ficca v. Astrue, 901 F. Supp.2d 533, 536 (M.D.Pa. 2012). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Pierce v. Underwood, 487 U.S. 552, 565 (1988). Substantial evidence is less than a preponderance of the evidence but more than a mere scintilla. Richardson v. Perales, 402 U.S. 389, 401 (1971). A single piece of evidence is not substantial evidence if the ALJ ignores countervailing evidence or fails to resolve a conflict created by the evidence. Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993). But in an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent [the ALJ's decision]

from being supported by substantial evidence." Consolo v. Fed. Maritime Comm'n, 383 U.S. 607, 620 (1966). "In determining if the Commissioner's decision is supported by substantial evidence the court must scrutinize the record as a whole." Leslie v. Barnhart, 304 F. Supp.2d 623, 627 (M.D.Pa. 2003).

The Supreme Court has underscored for us the limited scope of our review in this field, noting that:

> The phrase "substantial evidence" is a "term of art" used throughout administrative law to describe how courts are to review agency factfinding. T-Mobile South, LLC v. Roswell, 574 U.S. ——, ——, 135 S.Ct. 808, 815, 190 L.Ed.2d 679 (2015). Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains "sufficien[t] evidence" to support the agency's factual determinations. Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938) (emphasis deleted). And whatever the meaning of "substantial" in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence, this Court has said, is "more than a mere scintilla." Ibid.; see, e.g., Perales, 402 U.S. at 401, 91 S.Ct. 1420 (internal quotation marks omitted). It means—and means only—"such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Consolidated Edison, 305 U.S. at 229, 59 S.Ct. 206. See Dickinson v. Zurko, 527 U.S. 150, 153, 119 S.Ct. 1816, 144 L.Ed.2d 143 (1999) (comparing the substantial-evidence standard to the deferential clearly-erroneous standard).

Biestek, 139 S. Ct. at1154.

The question before this Court, therefore, is not whether the claimant is disabled, but rather whether the Commissioner's finding that she is not disabled is supported by substantial evidence and was reached based upon a correct application

of the relevant law. See Arnold v. Colvin, No. 3:12-CV-02417, 2014 WL 940205, at *1 (M.D.Pa. Mar. 11, 2014)("[I]t has been held that an ALJ's errors of law denote a lack of substantial evidence.") (alterations omitted); Burton v. Schweiker, 512 F. Supp. 913, 914 (W.D. Pa. 1981) ("The Secretary's determination as to the status of a claim requires the correct application of the law to the facts."); see also Wright v. Sullivan, 900 F.2d 675, 678 (3d Cir. 1990) (noting that the scope of review on legal matters is plenary); Ficca, 901 F. Supp.2d at 536 ("[T]he court has plenary review of all legal issues . . . .").

Several fundamental legal propositions which flow from this deferential standard of review. First, when conducting this review "we are mindful that we must not substitute our own judgment for that of the fact finder." Zirnsak v. Colvin, 777 F.3d 607, 611 (3d Cir. 2014) (citing Rutherford, 399 F.3d at 552). Thus, we are enjoined to refrain from trying to re-weigh the evidence. Rather our task is to simply determine whether substantial evidence supported the ALJ's findings. However, we must also ascertain whether the ALJ's decision meets the burden of articulation demanded by the courts to enable informed judicial review. Simply put, "this Court requires the ALJ to set forth the reasons for his decision." Burnett v. Comm'r of Soc. Sec. Admin., 220 F.3d 112, 119 (3d Cir. 2000). As the Court of Appeals has noted on this score:

In <u>Burnett</u>, we held that an ALJ must clearly set forth the reasons for his decision. 220 F.3d at 119. Conclusory statements . . . are insufficient. The ALJ must provide a "discussion of the evidence" and an "explanation of reasoning" for his conclusion sufficient to enable meaningful judicial review. <u>Id</u>. at 120; <u>see Jones v. Barnhart</u>, 364 F.3d 501, 505 & n. 3 (3d Cir.2004). The ALJ, of course, need not employ particular "magic" words: "<u>Burnett</u> does not require the ALJ to use particular language or adhere to a particular format in conducting his analysis." <u>Jones</u>, 364 F.3d at 505.

<u>Diaz v. Comm'r of Soc. Sec.</u>, 577 F.3d 500, 504 (3d Cir. 2009).

Thus, in practice ours is a twofold task. We must evaluate the substance of the ALJ's decision under a deferential standard of review, but we must also give that decision careful scrutiny to ensure that the rationale for the ALJ's actions is sufficiently articulated to permit meaningful judicial review.

## B. <u>Initial Burdens of Proof, Persuasion, and Articulation for the ALJ</u>

To receive benefits under the Social Security Act by reason of disability, a claimant must demonstrate an inability to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A); 42 U.S.C. §1382c(a)(3)(A); <u>see also</u> 20 C.F.R. §§404.1505(a), 416.905(a). To satisfy this requirement, a claimant must have a severe physical or mental impairment that makes it impossible to do his or her previous work or any other substantial gainful

activity that exists in the national economy. 42 U.S.C. §423(d)(2)(A); 42 U.S.C. §1382c(a)(3)(B); 20 C.F.R. §§404.1505(a), 416.905(a). To receive benefits under Title II of the Social Security Act, a claimant must show that he or she contributed to the insurance program, is under retirement age, and became disabled prior to the date on which he or she was last insured. 42 U.S.C. §423(a); 20 C.F.R. §404.131(a).

In making this determination at the administrative level, the ALJ follows a five-step sequential evaluation process. 20 C.F.R. §§404.1520(a), 416.920(a). Under this process, the ALJ must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment; (4) whether the claimant is able to do his or her past relevant work; and (5) whether the claimant is able to do any other work, considering his or her age, education, work experience and residual functional capacity ("RFC"). 20 C.F.R. §§404.1520(a)(4), 416.920(a)(4).

Between Steps 3 and 4, the ALJ must also assess a claimant's residual functional capacity (RFC). RFC is defined as "that which an individual is still able to do despite the limitations caused by his or her impairment(s)." Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 121 (3d Cir. 2000) (citations omitted); see also 20 C.F.R. §§404.1520(e), 404.1545(a)(1), 416.920(e), 416.945(a)(1). In making this

18

assessment, the ALJ considers all of the claimant's medically determinable impairments, including any non-severe impairments identified by the ALJ at step two of his or her analysis. 20 C.F.R. §§404.1545(a)(2), 416.945(a)(2).

Once the ALJ has made this determination, our review of the ALJ's assessment of the plaintiff's RFC is deferential, and that RFC assessment will not be set aside if it is supported by substantial evidence. Burns v. Barnhart, 312 F.3d 113, 129 (3d Cir. 2002); see also Metzger v. Berryhill, No. 3:16-CV-1929, 2017 WL 1483328, at *5 (M.D. Pa. Mar. 29, 2017), report and recommendation adopted sub nom. Metzgar v. Colvin, No. 3:16-CV-1929, 2017 WL 1479426 (M.D. Pa. Apr. 21, 2017); Rathbun v. Berryhill, No. 3:17-CV-00301, 2018 WL 1514383, at *6 (M.D. Pa. Mar. 12, 2018), report and recommendation adopted, No. 3:17-CV-301, 2018 WL 1479366 (M.D. Pa. Mar. 27, 2018).

At Steps 1 through 4, the claimant bears the initial burden of demonstrating the existence of a medically determinable impairment that prevents him or her in engaging in any of his or her past relevant work. Mason, 994 F.2d at 1064. Once this burden has been met by the claimant, it shifts to the Commissioner at Step 5 to show that jobs exist in significant number in the national economy that the claimant could perform that are consistent with the claimant's age, education, work

experience and RFC.   20 C.F.R. §§404.1512(f), 416.912(f); <u>Mason</u>, 994 F.2d at 1064.

The ALJ's disability determination must also meet certain basic substantive requisites. Most significant among these legal benchmarks is a requirement that the ALJ adequately explain the legal and factual basis for this disability determination. Thus, in order to facilitate review of the decision under the substantial evidence standard, the ALJ's decision must be accompanied by "a clear and satisfactory explication of the basis on which it rests." <u>Cotter v. Harris</u>, 642 F.2d 700, 704 (3d Cir. 1981).   Conflicts in the evidence must be resolved and the ALJ must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence.   <u>Id</u>. at 706-707.   In addition, "[t]he ALJ must indicate in his decision which evidence he has rejected and which he is relying on as the basis for his finding."   <u>Schaudeck v. Comm'r of Soc. Sec.</u>, 181 F. 3d 429, 433 (3d Cir. 1999).

### C.   <u>Legal Benchmarks Governing Step 3 of This Sequential Analysis</u>

This dichotomy between the Act's deferential standard of review and caselaw's requirement that ALJs sufficiently articulate their findings to permit meaningful judicial review is particularly acute at Step 3 of this disability evaluation process. At Step 3 of this sequential analysis, the ALJ is required to determine

whether, singly or in combination, a claimant's ailments and impairments are so severe that they are *per se* disabling and entitle the claimant to benefits. As part of this step three disability evaluation process, the ALJ must determine whether a claimant's alleged impairment is equivalent to a number of listed impairments, commonly referred to as listings, that are acknowledged as so severe as to preclude substantial gainful activity. 20 C.F.R. § 416.920(a)(4)(iii); 20 C.F.R. pt. 404, subpt. P, App. 1; Burnett, 220 F.3d 112, 119.

In making this determination, the ALJ is guided by several basic principles set forth by the social security regulations and case law. First, if a claimant's impairment meets or equals one of the listed impairments, the claimant is considered disabled *per se* and is awarded benefits. 20 C.F.R. §416.920(d); Burnett, 220 F.3d at 119. However, to qualify for benefits by showing that an impairment, or combination of impairments, is equivalent to a listed impairment, a plaintiff bears the burden of presenting "medical findings equivalent in severity to *all* the criteria for the one most similar impairment." Sullivan v. Zebley, 493 U.S. 521, 531 (1990); 20 C.F.R. §416.920(d). An impairment, no matter how severe, that meets or equals only some of the criteria for a listed impairment is not sufficient. Id.

The determination of whether a claimant meets or equals a listing is a medical one. To be found disabled under step three, a claimant must present medical

evidence or a medical opinion that his or her impairment meets or equals a listing. An administrative law judge is not required to accept a physician's opinion when that opinion is not supported by the objective medical evidence in the record. Maddox v. Heckler, 619 F. Supp. 930, 935-936 (D.C. Okl. 1984); Carolyn A. Kubitschek & Jon C. Dubin, Social Security Disability Law and Procedure in Federal Courts, § 3:22 (2014), *available at* Westlaw SSFEDCT. However, it is the responsibility of the ALJ to identify the relevant listed impairments, because it is "the ALJ's duty to investigate the facts and develop the arguments both for and against granting benefits." Burnett, 220 F.3d at 120 n.2.

On this score, however, it is also clearly established that the ALJ's treatment of this issue must go beyond a summary conclusion, since a bare conclusion "is beyond meaningful judicial review." Burnett, 220 F.3d at 119. Thus, case law "does not require the ALJ to use particular language or adhere to a particular format in conducting his analysis. Rather, the function . . . is to ensure that there is sufficient development of the record and explanation of findings to permit meaningful review." Jones, 364 F.3d at 505. This goal is met when the ALJ's decision, "read as a whole," id., permits a meaningful review of the ALJ's Step 3 analysis. However, when "the ALJ's conclusory statement [at Step 3] is . . . beyond meaningful judicial review," a

remand is required to adequately articulate the reasons for rejecting the claim at this potentially outcome-determinative stage. Burnett, 220 F.3d at 119.

### D.    Legal Benchmarks for the ALJ's Assessment of Medical Opinions

Pierce filed her disability application in April of 2018, following a paradigm shift in the manner in which medical opinions were evaluated when assessing Social Security claims. Prior to March 2017, ALJs were required to follow regulations that defined medical opinions narrowly and created a hierarchy of medical source opinions with treating sources at the apex of this hierarchy. However, in March of 2017, the Commissioner's regulations governing medical opinions changed in a number of fundamental ways. The range of opinions that ALJs were enjoined to consider were broadened substantially and the approach to evaluating opinions was changed from a hierarchical form of review to a more holistic analysis. As one court as aptly observed:

> The regulations regarding the evaluation of medical evidence have been amended for claims filed after March 27, 2017, and several of the prior Social Security Rulings, including SSR 96-2p, have been rescinded. According to the new regulations, the Commissioner "will no longer give any specific evidentiary weight to medical opinions; this includes giving controlling weight to any medical opinion." Revisions to Rules Regarding the Evaluation of Medical Evidence ("Revisions to Rules"), 2017 WL 168819, 82 Fed. Reg. 5844, at 5867–68 (Jan. 18, 2017), see 20 C.F.R. §§ 404.1520c(a), 416.920c(a). Instead, the Commissioner must consider all medical opinions and "evaluate their persuasiveness" based on the following five factors: supportability; consistency;

relationship with the claimant; specialization; and "other factors." 20 C.F.R. §§ 404.1520c(a)-(c), 416.920c(a)-(c).

Although the new regulations eliminate the perceived hierarchy of medical sources, deference to specific medical opinions, and assigning "weight" to a medical opinion, the ALJ must still "articulate how [he or she] considered the medical opinions" and "how persuasive [he or she] find[s] all of the medical opinions." Id. at §§ 404.1520c(a) and (b)(1), 416.920c(a) and (b)(1). The two "most important factors for determining the persuasiveness of medical opinions are consistency and supportability," which are the "same factors" that formed the foundation of the treating source rule. Revisions to Rules, 82 Fed. Reg. 5844-01 at 5853.

An ALJ is specifically required to "explain how [he or she] considered the supportability and consistency factors" for a medical opinion. 20 C.F.R. §§ 404.1520c (b)(2), 416.920c(b)(2). With respect to "supportability," the new regulations provide that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." Id. at §§ 404.1520c(c)(1), 416.920c(c)(1). The regulations provide that with respect to "consistency," "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." Id. at §§ 404.1520c(c)(2), 416.920c(c)(2).

Under the new regulations an ALJ must consider, but need not explicitly discuss, the three remaining factors in determining the persuasiveness of a medical source's opinion. Id. at §§ 404.1520c(b)(2), 416.920c(b)(2). However, where the ALJ has found two or more medical opinions to be equally well supported and consistent with the record, but not exactly the same, the ALJ must articulate how he or she considered those factors contained in paragraphs (c)(3) through (c)(5). Id. at §§ 404.1520c(b)(3), 416.920c(b)(3).

Andrew G. v. Comm'r of Soc. Sec., No. 3:19-CV-0942 (ML), 2020 WL 5848776, at *5 (N.D.N.Y. Oct. 1, 2020).

Oftentimes, as in this case, an ALJ must evaluate various medical opinions. Judicial review of this aspect of ALJ decision-making is still guided by several settled legal tenets. First, when presented with a disputed factual record, it is well established that "[t]he ALJ – not treating or examining physicians or State agency consultants – must make the ultimate disability and RFC determinations." Chandler v. Comm'r of Soc. Sec., 667 F.3d 356, 361 (3d Cir. 2011). Thus, when evaluating medical opinions " the ALJ may choose whom to credit but 'cannot reject evidence for no reason or for the wrong reason.'" Morales v. Apfel, 225 F.3d 310, 317 (3d Cir. 2000) (quoting Mason, 994 F.2d at 1066). Therefore, provided that the decision is accompanied by an adequate, articulated rationale, it is the province and the duty of the ALJ to choose which medical opinions and evidence deserve greater weight.

Further, in making this assessment of medical evidence:

An ALJ is [also] entitled generally to credit parts of an opinion without crediting the entire opinion. See Thackara v. Colvin, No. 1:14–CV–00158–GBC, 2015 WL 1295956, at *5 (M.D. Pa. Mar. 23, 2015); Turner v. Colvin, 964 F. Supp. 2d 21, 29 (D.D.C. 2013) (agreeing that "SSR 96–2p does not prohibit the ALJ from crediting some parts of a treating source's opinion and rejecting other portions"); Connors v. Astrue, No. 10–CV–197–PB, 2011 WL 2359055, at *9 (D.N.H. June 10, 2011). It follows that an ALJ can give partial credit to all medical opinions and can formulate an RFC based on different parts from the

different medical opinions. See e.g., Thackara v. Colvin, No. 1:14–CV–00158–GBC, 2015 WL 1295956, at *5 (M.D. Pa. Mar. 23, 2015).

Durden v. Colvin, 191 F.Supp.3d 429, 455 (M.D. Pa. 2016.

It is against these legal benchmarks that we assess the instant appeal.

**E.**     **The ALJ's Decision in this Case is Supported by Substantial Evidence.**

In this setting, we are mindful that we are not free to substitute our independent assessment of the evidence for the ALJ's determinations. Rather, we must simply ascertain whether the ALJ's decision is supported by substantial evidence, a quantum of proof which is less than a preponderance of the evidence but more than a mere scintilla, Richardson, 402 U.S. at 401, and "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Pierce, 487 U.S. at 565.

Judged against these deferential standards of review, we find that substantial evidence supported the decision by the ALJ that Pierce had not met the listing requirements which would have defined her as *per se* disabled due to her emotional impairments and was capable of performing a limited range of work. Therefore we will affirm this decision.

Pierce encounters two obstacles in advancing this claim. First, she must make an exacting showing to prevail at Step 3 of this sequential analysis. To qualify for benefits at Step 3 by showing that an impairment, or combination of impairments, is equivalent to a listed impairment, a plaintiff bears the burden of presenting "medical findings equivalent in severity to *all* the criteria for the one most similar impairment." Sullivan v. Zebley, 493 U.S. 521, 531 (1990); 20 C.F.R. §416.920(d). An impairment, no matter how severe, that meets or equals only some of the criteria for a listed impairment is not sufficient. Id.

In this case, the ALJ found that Pierce had not satisfied the paragraph B criteria for Listing 12.04. As to these listing criteria, it is well established that:

> The Paragraph B criteria of Listings 12.02, 12.03, 12.04, 12.06, and 12.08 are identical, and require the ALJ to assess the degree of a claimant's limitation in four broad functional areas: activities of daily living; social functioning; maintaining concentration, persistence or pace; and whether the claimant has experienced repeated episodes of decompensation of extended duration. The first three areas are assessed on the following five-point scale: none, mild, moderate, marked, and extreme. 20 C.F.R. §§ 404.1520a(c)(4), 416.920a(c)(4). The fourth area, episodes of decompensation of extended duration, is rated on the following four-point scale: none, one or two, three, four or more. Id. The last point on each scale represents a degree of limitation that is incompatible with the ability to do any gainful work. Id. The Paragraph B criteria are met where an impairment results in two of the following: a marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence or pace; or repeated episodes of

decompensation, each of extended duration. 20 C.F.R. Part 404, Subpart P, Appendix 1 §§ 12.02, 12.03, 12.04, 12.06, 12.08.

Martinez v. Colvin, No. 3:14-CV-1090, 2015 WL 5781202, at *8 (M.D. Pa. Sept. 30, 2015). Given these listing criteria that require a finding of two marked impairments, and the ALJ's finding that Pierce only experienced moderate impairments in these work-related spheres, in order to set aside this decision it would be necessary to conclude that the ALJ erred twice in evaluating the severity of Pierce's mental impairments. In addition, we would have to reach this conclusion that the ALJ erred on multiple scores while applying a deferential standard of review with respect to the ALJ's factual findings, which simply require a quantum of proof that is less than a preponderance of the evidence but more than a mere scintilla, Richardson, 402 U.S. at 401, and "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Pierce, 487 U.S. at 565.

Judged by these standards, it cannot be said that the ALJ erred in this Step 3 determination or in the evaluation of the medical opinion evidence. While Pierce doubtless encounters significant emotional impairments, a state agency expert, and a consulting examining expert both concluded that her emotional impairments only imposed moderate limitations on her work-related activities. As the ALJ noted, these

two expert opinions were consistent with Pierce's treatment records, activities of daily living, and past employment history.

In contrast, Dr. McNamara's opinion added little to any understanding of Pierce's ability to work on a sustained basis since this opinion simply does not address the listing requirements in a meaningful way. Similarly, Ms. Nobles' severely restrictive opinion which found that Pierce suffered from a host of marked impairments was not fully consistent with her own treatment notes, which described a less profound degree of impairment. Given the disparity between these treatment notes and Ms. Nobles' medical opinion, the ALJ was justified in finding that opinion less persuasive than the other medical opinions in this case since an ALJ may conclude that discrepancies between the treating source's medical opinion, and the doctor's actual treatment notes, justifies giving a treating source opinion little weight in a disability analysis. Torres v. Barnhart, 139 F. App'x 411, 415 (3d Cir. 2005).

In sum, in this case, the ALJ was confronted by a medical record that contained competing and contrasting medical opinions. On these facts, the ALJ found that the medical opinions which found that Pierce was only moderately impaired were more persuasive than those which suggested that she suffered from marked impairments. There is sufficient evidence in the record to support the ALJ's analysis of these medical opinions. Having made these factual determinations, the

ALJ concluded that Pierce had not met the stringent standards justifying an award of benefits at Step 3.

It is the right and responsibility of the ALJ to make such assessments and we find that substantial evidence supported the ALJ's decision in the instant case. Thus, at bottom, it appears that Pierce is requesting that this Court re-weigh the evidence. This we may not do. See, e.g., Rutherford, 399 F.3d at 552 (quoting Williams v. Sullivan, 970 F.2d 1178, 1182 (3d Cir. 1992) ("In the process of reviewing the record for substantial evidence, we may not 'weigh the evidence or substitute our own conclusions for those of the fact-finder'")). Because we cannot re-weigh the evidence, and because we find that the ALJ properly articulated that substantial evidence did not support this disability claim, we will affirm the ALJ's decision in this case.

In closing, the ALJ's assessment of the evidence in this case complied with the dictates of the law and was supported by substantial evidence. This is all that the law requires, and all that a claimant can demand in a disability proceeding. Thus, notwithstanding the argument that this evidence might have been viewed in a way which would have also supported a different finding, we are obliged to affirm this ruling once we find that it is "supported by substantial evidence, 'even [where] this court acting *de novo* might have reached a different conclusion.' " Monsour Med.

Ctr. v. Heckler, 806 F.2d 1185, 1190–91 (3d Cir. 1986) (quoting Hunter Douglas, Inc. v. NLRB, 804 F.2d 808, 812 (3d Cir. 1986)). Accordingly, under the deferential standard of review that applies to appeals of Social Security disability determinations, we find that substantial evidence supported the ALJ's evaluation of this case.

## IV.   **Conclusion**

Accordingly, for the foregoing reasons, IT IS ORDERED that the final decision of the Commissioner denying these claims is AFFIRMED.

An appropriate order follows.

/s/ *Martin C. Carlson*
Martin C. Carlson
United States Magistrate Judge

May  13, 2021